### In re PENNIE & EDMONDS LLP, Appellant.

### No. 02–7177.

United States Court of Appeals, Second Circuit.

Argued: Sept. 11, 2002.

Decided: March 14, 2003.

Frank H. Wright, Frank H. Wright & Associates, New York, N.Y., for Appellant.

Before: NEWMAN and F.I. PARKER, Circuit Judges; and UNDERHILL,* District Judge.

Judge UNDERHILL dissents with a separate opinion.

JON O. NEWMAN, Circuit Judge.

This appeal presents a narrow issue concerning the applicable *mens rea* standard when a trial judge, *sua sponte*, initiates a post-trial Rule 11 sanction proceeding because a lawyer permitted a client to submit a false affidavit at an earlier stage of the litigation. The specific issue is whether the lawyer's liability for the sanction re-quires a mental state of bad faith or only objective unreasonableness in circumstances where the lawyer has no opportunity to withdraw or correct the challenged submission. Pennie & Edmonds LLP ("P & E") appeals from the January 17, 2002, order of the District Court for the Southern District of New York (John S. Martin, District Judge) ruling that the law firm violated Rule 11(b)(3) of the Federal Rules of Civil Procedure. We conclude that where, as here, a *sua sponte* Rule 11 sanction denies a lawyer the opportunity to withdraw the challenged document pursuant to the "safe harbor" provision of Rule 11(c)(1)(A), the appropriate standard is subjective bad faith. In this case, the District Court accepted the firm's assertion that it acted in subjective good faith. We therefore vacate the sanction ruling.

## Background

The sanction proceeding had its origin in trademark litigation concerning the marketing of pasta sauce. A detailed account of that litigation is set forth in *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209 (2d Cir.2003). For purposes of this appeal, we recount only the following circumstances. One issue in the trademark litigation was the date when the Defendants had begun using allegedly infringing labels on their product. They initially contended that their labels were first used in 1993, before the Plaintiff started marketing its product. At an early stage of the litigation, before P & E had entered its appearance, the Defendants presented two documents in support of the 1993 usage: what purported to be an example of the allegedly infringing label and what purported to be an invoice from a printer showing that this label had been printed in

---

* Honorable Stefan R. Underhill of the United States District Court for the District of Con- necticut, sitting by designation.

1993. The probative value of these documents was destroyed by evidence that a bar code on the label did not exist until at least 1998 and the area code for a phone number on the invoice did not exist until some time after 1993. The Defendants then disclaimed reliance on the fraudulent documents.

After the District Court granted the Plaintiff's motion for a preliminary injunction, P & E appeared for the Defendants. Two partners of the firm queried two of the Defendants concerning the previous submission of the fraudulent documents. One Defendant, Frank Brija, said that the submitted label was a 1999 label that he had inadvertently submitted and that a similar label had in fact been used in 1993. Brija also said that, after the fraudulent invoice had been submitted, he was told by the printer that the printer had been unable to locate any of the original invoices and had therefore, without the Defendants' knowledge, reconstructed an invoice to reflect the printer's recollection of the printing order. Brija showed the lawyers an affidavit, purportedly signed by the printer, which stated that the printer had reconstructed the invoice and did not recall telling Brija that the document sent to Brija for submission to the Court was not a copy of the original invoice.

Substantial doubts about these explanations later arose from at least two circumstances. The 1999 label, which Brija claimed was similar to the label used in 1993, bore a trademark registration symbol for a mark that was not registered until several years after 1993. In addition, when the P & E lawyers contacted a lawyer for the printer, they were told that the printer, if subpoenaed for a trial, would testify that he had not done any business with the Defendants in the relevant time period. The P & E lawyers questioned Brija, who insisted that his explanation for the submission of the fraudulent label and invoice was true.

Thereafter, the Plaintiff moved for summary judgment. Among the papers submitted by the Defendants in opposition was an affidavit of Brija's that became the basis for the Rule 11 sanction. Two paragraphs of that affidavit repeated Brija's explanation for the submission of the fraudulent documents: inadvertence as to the first "1993" label and the printer's undisclosed reconstruction of the invoice.

The District Court granted summary judgment for the Plaintiff. The Court's opinion reflected Judge Martin's view that Brija's explanation for the fraudulent documents was false. At the end of the opinion explaining that ruling, the Court *sua sponte* ordered P & E to show cause why the firm should not be sanctioned under Rule 11 for permitting Brija to submit a false affidavit. P & E's response detailed the steps taken to investigate Brija's explanations and reported Brija's repeated insistence that he was telling the truth.

In an opinion and order entered January 17, 2001, the District Court sanctioned P & E under Rule 11 for permitting Brija to file an affidavit containing statements that the law firm could not have objectively believed were true. Judge Martin accepted the firm's assertion that it had acted in subjective good faith. As a penalty, the firm was ordered to send copies of the Court's sanction opinion to every lawyer in the firm, with a memorandum stating that the firm adheres to the highest ethical standards and that, if such adherence causes the loss of a client, the lawyer will suffer no adverse consequence. The sanction order has been stayed pending this appeal.

## Discussion

■ Rule 11 was amended in 1993 in two respects relevant to the pending ap-

peal. First, the standard for imposing sanctions because of written factual contentions submitted to a district court was changed. Under the prior standard, a signature on a document certified that the contentions contained in it were "well grounded in fact." 2 *Moore's Federal Practice* § 11 App.02 [1] (3d ed.2001) (quoting Fed.R.Civ.P. 11 (1983)). Under the current standard, presenting a document to the court certifies "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . (3) the allegations and other factual contentions have evidentiary support . . . ." Fed.R.Civ.P. 11(b) (as amended 1993).

Second, a "safe harbor" provision was added, providing an opportunity to withdraw or correct a challenged submission. Where a sanction is initiated by a party's motion, this provision requires initial service of the motion but delays filing or presentation of the motion to the court for 21 days; filing of the motion is permitted 21 days after service only if the challenged submission is not "withdrawn or appropriately corrected." *Id.* 11(c)(1)(A). Although Rule 11 contains no explicit time limit for serving the motion, the "safe harbor" provision functions as a practical time limit, and motions have been disallowed as untimely when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission. *See Barber v. Miller*, 146 F.3d 707, 710–11 (9th Cir.1998) (Rule 11 sanction disallowed where motion filed after complaint dismissed); *Ridder v. City of Springfield*, 109 F.3d 288, 295–97 (6th Cir. 1997) ("A party must now serve a Rule 11 motion on the allegedly offending party at least twenty-one days prior to conclusion of the case or judicial rejection of the offending contention"; Rule 11 sanction disallowed where motion filed after summary judgment motion granted); *DeShiro v. Branch*, 183 F.R.D. 281, 287–88 (M.D.Fla.1998) (same); *Daliessio v. De-Puy, Inc.*, 178 F.R.D. 451, 452 (E.D.Pa. 1998) (Rule 11 motion disallowed where motion not served on adverse party prior to entry of final judgment). The Advisory Committee on Civil Rules contemplated that Rule 11 motions would be deemed untimely if filed too late to permit correction or withdrawal,[1] and the Moore treatise endorses this approach.[2]

A sanction proceeding may also be initiated by a court on its own motion by issuance of a show cause order, *see id.* 11(c)(1)(B), but no "safe harbor" opportunity exists to withdraw or correct a submission challenged in a court-initiated proceeding, *id.*

In recommending the "safe harbor" provision, the rule-makers explicitly noted its

---

1. Ordinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely. . . . Given the "safe harbor" provisions . . . a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention).

   Fed.R.Civ.P. 11 advisory committee's note to 1993 Amendments.

2. The 21–day, safe-harbor service requirement controls not only the earliest date on which a motion may be filed . . . , it also indirectly controls the last date on which a Rule 11 sanctions motion may be filed. At the very least, a party must serve its Rule 11 motion before the court has ruled on the pleading, and thus before the conclusion of the case. Otherwise, the purpose of the "safe harbor" provision would be nullified. This has been interpreted to mean that Rule 11 motions must be served at least a full 21 days before the court concludes the case or resolves the offending contention . . . .

   2 *Moore's Federal Practice* § 11.22[1](c) (3d ed.2001) (footnotes omitted).

unavailability for sanction proceedings initiated by a court and expressed their view that, as a result, court-initiated sanction proceedings would be used only in more egregious circumstances:

> Since show cause orders will ordinarily be issued only in situations that are akin to a contempt of court, the rule does not provide a "safe harbor" to a litigant for withdrawing a claim, defense, etc., after a show cause order has been issued on the court's own initiative.

Fed.R.Civ.P. 11 advisory committee's note to 1993 Amendments. We have noted that the Advisory Committee's "akin to a contempt" standard is applicable to sanction proceedings initiated by a court, *see Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1329 (2d Cir.1995), as have other circuits, *see Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 151 (4th Cir.2002); *Barber v. Miller*, 146 F.3d 707, 711 (9th Cir.1998). Courts have taken the Advisory Committee's note to mean that *sua sponte* Rule 11 sanctions must be reviewed with "particular stringency." *Hunter*, 281 F.3d at 153; *United National Insurance Co. v. R & D Latex Corp.*, 242 F.3d 1102, 1115 (9th Cir. 2001). However, we have not explicitly ruled on the applicable *mens rea* standard in such circumstances.

■ The mental state applicable to liability for Rule 11 sanctions initiated by motion is objective unreasonableness, *i.e.*, liability may be imposed if the lawyer's claim to have evidentiary support is not objectively reasonable. *See Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir.1997). That standard is appropriate in circumstances where the lawyer whose submission is challenged by motion has the op-

portunity, afforded by the "safe harbor" provision, to correct or withdraw the challenged submission. P & E contends that, because the "safe harbor" protection does not exist when a lawyer's submission is challenged in a show cause proceeding initiated by a trial judge, the more rigorous standard of bad faith should apply. That position draws support from the Advisory Committee's expectation that court-initiated sanction proceedings will ordinarily be used only in situations that are "akin to a contempt of court."

We have previously held that when courts are acting either pursuant to their inherent powers or their statutory power to impose contempt sanctions upon attorneys while those attorneys are engaged in matters intended to further the interests of their clients, a finding of bad faith on the part of the attorney is essential to a finding of contempt.[3] *See, e.g., Schlaifer Nance & Co., Inc. v. Estate of Andy Warhol*, 194 F.3d 323, 338 (2d Cir.1999) (sanctions imposed pursuant to court's inherent powers doctrine as well as 28 U.S.C. § 1927 require highly specific finding of bad faith) (citing *Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 38 (2d Cir.1995)); *Sakon v. Andreo*, 119 F.3d 109, 114 (2d Cir.1997) (same) (citations omitted). These cases provide strong support for the proposition that, when applying sanctions under Rule 11 for conduct that is "akin to a contempt of court," a bad faith standard should apply.

Any regime of sanctions for a lawyer's role in the course of representing a client inevitably has implications for the functioning of the adversary process. If the

---

**3.** In some cases, we applied a lesser standard of wilfulness or purposefulness, but such cases were decided under specific rules or scenarios not applicable to the circumstances of this case. *See, e.g., City of New York v. Local 28, Sheet Metal Workers' Int'l Assn.*, 170 F.3d 279, 282–83 (2d Cir.1999) (court may find party in contempt upon "clear and convincing" showing that party violated a "clear and unambiguous" order of the court; wilful noncompliance is not required) (citations omitted).

sanction regime is too severe, lawyers will sometimes be deterred from making legitimate submissions on behalf of clients out of apprehension that their conduct will erroneously be deemed improper. On the other hand, if the sanction regime is too lenient, lawyers will sometimes be emboldened to make improper submissions on behalf of clients, confident that their misconduct will either be undetected or dealt with too leniently to matter. The 1993 amendments to Rule 11 strike a sensible balance between these extremes by making a lawyer sanctionable for an objectively unreasonable submission and at the same time affording the lawyer a "safe harbor" opportunity to reconsider and withdraw a submission challenged by an adversary.

However, when a lawyer's submission, unchallenged by an adversary, is subject to sanction by a court, the absence of a "safe harbor" opportunity to reconsider risks shifting the balance to the detriment of the adversary process. The risk is that lawyers will sometimes withhold submissions that they honestly believe have plausible evidentiary support for fear that a trial judge, perhaps at the conclusion of a contentious trial, will erroneously consider their claimed belief to be objectively unreasonable. This risk is appropriately minimized, as the Advisory Committee contemplated, by applying a "bad faith" standard to submissions sanctioned without a "safe harbor" opportunity to recon-

sider. A vigorous adversary process is better served by avoiding the inhibiting effect of an "objectively unreasonable" standard applied to unchallenged submissions, and letting questionable evidence be tested with cross-examination and opposing evidence than by encouraging lawyers to withhold such evidence. It is better to apply a heightened *mens rea* standard to unchallenged submissions and take the slight risk with respect to such submissions that, on occasion, a jury will give unwarranted weight to a few submissions that a judge would consider objectively unreasonable than to withhold from the jury many submissions that are objectively reasonable but that cautious lawyers dare not present.

It is arguable, as P & E contends, that a "bad faith" standard should apply to all court-initiated Rule 11 sanctions because no "safe harbor" protection is available and because the Advisory Committee contemplated such sanctions for conduct akin to contempt. However, we need not make so broad a ruling in the pending case. Not only was the sanction against P & E initiated by the District Court, it was initiated long after P & E had an opportunity to correct or withdraw the challenged submission. At least in such circumstances, a "bad faith" standard, applicable for contempt proceedings, is especially appropriate and is what the rule-makers contemplated.[4] We need not decide the standard

---

4. Our dissenting colleague accords less significance to the Advisory Committee's note than we do. We have taken seriously the Committee's expectation that show cause orders will be issued in circumstances where the challenged conduct is "akin to contempt," which, as we have noted, requires bad faith. Nor do we think the Committee was using the contempt analogy merely to be predictive. By declining to make the "safe harbor" provision applicable to court-initiated show cause orders, the Committee was signaling that the unavailability of an opportunity to withdraw

or correct makes the sanction appropriate for conduct "akin to contempt," conduct that traditionally requires a heightened *mens rea* standard. We believe we implement the Committee's expectation by applying a contempt-like *mens rea* standard to court-initiated show cause orders issued where there is no opportunity to withdraw or correct.

In reaching our conclusion, we have not, as Judge Underhill apprehends, applied our own notions of public policy. Rather, we have discussed the policy implications of our ruling

for a sanction proceeding initiated earlier in the litigation at a time when the challenged submission could be corrected or withdrawn as part of the lawyer's response to the show cause order, even though the Rule does not explicitly guarantee a "safe harbor" protection in such circumstances.[5]

Judge Martin gave several reasons for applying an "objective unreasonableness" standard, rather than a "bad faith" standard, to a court-initiated Rule 11 sanction. First, he properly considered the issue open in this Circuit, noting that the reference in *Hadges* to the Advisory Committee's note was not a holding. Next, he emphasized the Committee's use of the word "ordinarily" in its identification of contempt-like circumstances as those that warrant court-initiated sanctions. Third, he cited language in *Wilder v. GL Bus Lines*, 258 F.3d 126 (2d Cir.2001), stating that Rule 11 sanctions are appropriate "where the attorney has negligently or recklessly failed to perform his responsibilities as an officer of the court." *Id.* at 128. Finally, he reasoned that "[s]ince the

Court as an institution has a far greater interest in weeding out abuses than does any individual litigant, there is no reason not to apply the well-established 'objective reasonableness' standard to Rule 11 proceedings initiated by the Court." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 2002 WL 59434, at *6 (S.D.N.Y. Jan.16, 2002). We are not persuaded.

We do not regard the Advisory Committee's use of "ordinarily" as indicating that the Committee had some particular category of cases in mind where court-initiated Rule 11 sanctions could be imposed in the absence of conduct "akin to contempt." The word "ordinarily" is frequently used (some might say "ordinarily used") simply to reflect a natural reluctance of rule-makers to say "always," in candid recognition of their inability to anticipate every imaginable set of circumstances that might one day arise. *Cf. United States v. Turkish,* 623 F.2d 769, 777 (2d Cir.1980) ("[T]here is a natural judicial reluctance to say 'never.' ").

and the adverse implications of a contrary ruling only to indicate the soundness of the Advisory Committee's expectation that show cause orders issued without an opportunity to withdraw or correct a challenged submission will be used in circumstances akin to contempt.

Finally, we cannot leave unanswered the dissent's observation that our conclusion must be flawed because no court interpreting the 1993 version of Rule 11 has applied the bad faith standard to the circumstances where we rule it to be applicable. What the dissent fails to mention is that no court has considered the argument presented on this appeal: that the bad faith standard applies to a court-initiated show cause order issued where an opportunity for withdrawal or correction is unavailable. Although *Hunter* involved a show cause order issued in the absence of an opportunity to correct or withdraw the challenged document, the Fourth Circuit's ruling was that the sanction should be vacated. *Hunter,* 281 F.3d at 158.

**5.** We note that the Advisory Committee considered and rejected a proposal to provide "safe harbor" protection for court-initiated sanctions:

> Several groups have suggested that the safe harbor provisions, which under the published draft apply only to motions filed by other litigants, should apply also to show cause orders issued at the court's own initiative. The Advisory Committee continues to believe that court-initiated show cause orders—which typically relate to matters that are akin to contempt of court—are properly treated somewhat differently from party-initiated motions.

Letter from Hon. Sam C. Pointer, Chairman, Advisory Committee on Civil Rules, to Hon. Robert E. Keeton, Chairman, Standing Committee on Rules of Practice and Procedure (May 1, 1992), *reprinted in* 146 F.R.D. 519, 525 (1993).

The language Judge Martin quoted from *Wilder* must not be separated from the context supplied by the citation that follows it, *United States v. Seltzer*, 227 F.3d 36, 40–42 (2d Cir.2000). *Seltzer* involved a sanction, pursuant to a court's inherent authority, imposed because of a lawyer's tardy return to a court session. Noting that the conduct at issue was not undertaken "as part of [the lawyer's] role in representing her client," *id.* at 41, but involved "a lawyer's negligent or reckless failure to perform his or her responsibility as an officer of the court," *id.*, we ruled that in such circumstances a sanction may be justified "absent a finding of bad faith," *id. Wilder* used the "negligently or recklessly" standard in referring to a lawyer's non-representational conduct, in contrast to the heightened standard applicable where "the lawyer has acted in bad faith in the actions that led to the lawsuit or in the conduct of the litigation." *Wilder*, 258 F.3d at 130. *Wilder*, which concerned whether a lawyer is liable for costs imposed under Rule 54, is not authority for dispensing with a "bad faith" standard where a Rule 11 sanction is imposed without the availability of the "safe harbor" protection.

As for Judge Martin's appropriate concern for a court's responsibility to "weed out abuses," we believe, for reasons already explained, that his application of an "objectively unreasonable" standard, in the absence of either an explicit "safe harbor" protection or an equivalent opportunity where a court initiates a Rule 11 proceeding at an early stage of litigation, risks more damage to the robust functioning of the adversary process than the benefit it would achieve. We do not doubt that his standard would deter some submissions deserving condemnation. We are concerned that its deterrent effect would broadly reach some submissions that should merit a fact-finder's consideration and assessment.

Because Judge Martin accepted P & E's representation that its lawyers acted with subjective good faith, the Rule 11 sanction must be vacated. In view of our disagreement with Judge Martin as to the *mens rea* element, we need not consider P & E's further contention that the District Court erred in framing the issue to be whether the lawyers' belief to be tested was their belief that Brija's statements were true, rather than their belief that their submissions had evidentiary support.

### Conclusion

The order imposing a Rule 11 sanction is vacated. No costs.

UNDERHILL, District Judge, dissenting.

Prior to 1983, the imposition of sanctions under Rule 11 required a finding of subjective bad faith. When amending Rule 11 in 1983, however, the drafters abandoned the subjective bad faith standard and adopted a standard of "reasonableness under the circumstances." Since adoption of the 1983 amendments, the Supreme Court and every court of appeals has held that district courts should apply an objective reasonableness test when deciding whether Rule 11 has been violated. With today's decision, the Second Circuit becomes the first and only court to hold that the 1993 amendments to Rule 11 reverted to the pre–1983 subjective bad faith standard for even a subset of Rule 11 sanctions. The majority bases its holding principally on a single sentence from the Advisory Committee notes to the 1993 amendments and on its own policy analysis. In my view, neither basis can support the weight of today's decision. Accordingly, I respectfully dissent.

*The Plain Meaning of Rule 11*

Interpretation of Rule 11 begins with its text, because this Court must "interpret Rule 11 according to its plain meaning." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 391, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). A plain reading of Rule 11 demonstrates that a single *mens rea* requirement applies to sanctionable conduct, regardless of whether a court or a party initiates sanctions proceedings and regardless of whether counsel had an opportunity to withdraw the offending submission.

Rule 11 has four subsections. *Section (a)* establishes the requirement that every paper filed with the court shall be signed. *Section (b)* contains a statement of the conduct—and the state-of-mind requirement—to which counsel and parties will be held under the rule. By presenting a paper to the court, the lawyer or pro se party certifies "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" the paper meets the standards set in section (b)(1) through (b)(4). Section (b) creates an objective standard of "reasonableness under the circumstances." *See Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 548–49, 551, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). *Section (c)* governs the sanctions that can be imposed for violation of the standards set forth in section (b). *See* Fed.R.Civ.P. 11(c) ("If ... the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon. the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation."). Finally, *section (d)* makes Rule 11 inapplicable to discovery.

The fundamental flaw in the majority's interpretation of Rule 11 is that it seeks to use procedural distinctions drawn in sec-

tion (c), regarding *how* sanctions can be imposed with and without a motion, to modify the substantive requirements of section (b), which controls *whether* a violation of Rule 11 has occurred. Under a plain reading of Rule 11, the procedural distinctions set forth in section (c) have no bearing whatsoever on the state-of-mind requirement of section (b).

The majority does not cite to any language in the rule itself that marks a distinction in the state-of-mind required for imposition of sanctions with and without a motion by counsel, because no such language exists. Instead, the majority holds that the Advisory Committee intended to change the *mens rea* applicable to a class of Rule 11 sanctions by making a single comment in the lengthy notes to the 1993 amendment. In so doing, the majority establishes a new substantive standard based on what I believe is a misreading of the Advisory Committee's intent.

*The Advisory Committee's Intent*

The majority bases its holding on a single sentence from the lengthy Advisory Committee notes to the 1993 amendment to Rule 11. That sentence (hereinafter the "Show Cause Sentence") reads: "Since show cause orders *will ordinarily be issued* only in situations that are akin to a contempt of court, the rule does not provide a 'safe harbor' to a litigant for withdrawing a claim, defense, etc., after a show cause order has been issued on the court's own initiative." (Emphasis supplied.) In the majority's view, that sentence requires courts to apply the *mens rea* applicable to contempt proceedings to court-initiated Rule 11 proceedings if there is no opportunity to withdraw the offending submission.

In my view, the Show Cause Sentence reflects the Advisory Committee's empirical observation about the frequency with which show cause orders "will ... be is-

sued." That is, courts will initiate Rule 11 sanctions proceedings only when conduct is so egregious that it is akin—i.e., similar in kind—to conduct punishable by contempt. The observation in the Show Cause Sentence was based upon the voluminous empirical evidence available to and relied upon by the Advisory Committee when drafting the 1993 amendments.[1] In other words, the Show Cause Sentence is predictive, not restrictive; the reference to contempt describes the seriousness of the conduct likely to prompt a court to issue a show cause order initiating sanctions proceeding, not the *mens rea* necessary before sua sponte sanctions can permissibly be imposed. *See Proposed Amendments to the Federal Rules of Civil Procedure: Hearing before the Subcommittee on Courts and Administrative Practice of the U.S. Senate Committee on the Judiciary,* 103rd Cong. 9 (July 28, 1993) (hereinafter *"Courts and Administrative Practice Subcomm. Hearing"*) (Prepared Statement of Judge Sam C. Pointer, Jr. to Senate Judiciary Committee: "It should be noted that the 'safe harbor' applies only to party-initiated motions; these provisions will not prevent court-initiated sanctions, which would be appropriately invoked by the

more egregious violations that burden or offend the court."); *id.* at 47 (Testimony of Judge Sam C. Pointer, Jr. to Senate Judiciary Committee: "There is no safe harbor in terms of a court-initiated sanction, and in that situation if it appears that somebody is simply filing and making broad, unsubstantiated allegations without any investigation that they could have made, then it seems to me that rule 11 would properly be invoked by the court.").

It bears saying that no court interpreting the 1993 version of Rule 11 has held that a finding of subjective bad faith is required before imposing Rule 11 sanctions under any procedural circumstances. As the majority opinion acknowledges, the decision in *Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320 (2d Cir.1995), mentioned the Show Cause Sentence only in *dicta:* "In this case, the [district] court indicated that it was imposing sanctions in response to [defendant's] request and did not state that it was imposing sanctions on Hadges sua sponte." *Id.* at 1329.

The majority correctly notes that the Fourth and Ninth Circuits have cited the Show Cause Sentence, but those courts have *not* held that the pre–1983 subjective

1. The empirical sources cited in the second sentence of the Advisory Committee notes to the 1993 amendment include the survey conducted by the Federal Courts Committee of the New York State Bar Association, which noted that court-initiated Rule 11 sanctions "are relatively infrequent: 81% of those who had ordered sanctions *sua sponte* had done so less than five times in the past three years, 14% had done so six to ten times, and only one judicial respondent had done so 11 or more times in the past three years." New York State Bar Committee on Federal Courts, *Sanctions and Attorneys' Fees* 22 (1987). The other sources cited by the Advisory Committee similarly reflect infrequent imposition of court-initiated sanctions. *See* American Judicature Society, *Report of the Third Circuit Task Force on Federal Rule of Civil Procedure 11* 57 (S. Burbank ed., 1989) ("In our sanc-

tion survey, trial judges imposed sanctions *sua sponte* in 6.6% of the cases . . . ."); T. Willging, *The Rule 11 Sanctioning Process* 76 (Federal Judicial Center 1988) (Eighteen percent of survey responses involved sua sponte sanctions); E. Wiggins, T. Willging, and D. Stienstra, *Report on Rule 11* § 1B, table 5, at 5 (Federal Judicial Center 1991) (In five districts surveyed, sua sponte orders ranged from 2% to 7% of all Rule 11 motions/orders.); *id.* § 2A at 12 ("Very few of these orders were issued sua sponte. . . . Sixty-nine percent of the judges said they had issued no sua sponte orders in the last twelve months. . . . Sixteen percent estimated that they had issued one sua sponte order, and 6% estimated that they had issued two such orders. Few judges issued more than two sua sponte orders.").

bad faith standard governs any subset of court-initiated Rule 11 sanctions decisions. *Hunter v. Earthgrains Co. Bakery,* 281 F.3d 144, 151 (4th Cir.2002) (In the absence of the safe harbor, "a court is obligated to use extra care in imposing sanctions."); *United National Ins. Co. v. R & D Latex Corp.,* 242 F.3d 1102, 1115 (9th Cir.2001) (Rule 11(b)(2) standard "is applied with particular stringency where, as here, the sanctions are imposed on the court's own motion."); *Barber v. Miller,* 146 F.3d 707, 711 (9th Cir.1998) ("[T]he fact that a district court has exercised its discretion to award sanctions on motion of a party does not necessarily mean that the court would exercise its discretion to impose sanctions on its own motion for the same conduct.").

In *Hunter,* the procedural context was in all relevant respects the same as that presented here. In both cases the district courts issued show cause orders as part of their rulings on summary judgment, and in both cases counsel had no opportunity to withdraw the offending submission. Indeed, the district court in *Hunter* issued its sua sponte sanctions order more than two years after granting summary judgment. *Hunter,* 281 F.3d at 149. Still, the Fourth Circuit, which cited and relied upon the Show Cause Sentence, did not hold that a subjective bad faith standard was required for the issuance of court-initiated Rule 11 sanctions under those circumstances.

Both leading commentators of federal court practice recognize that courts should apply an objective reasonableness standard whenever imposing Rule 11 sanctions. *See* 2 James Wm. Moore, et al., *Moore's Federal Practice* § 11.11[3] (3d ed. 2000) ("The courts have interpreted Rule 11 as establishing an objective standard of conduct for litigants and attorneys."); *id.* § 11.11[4] ("A violation of Rule 11 does not require subjective bad faith."); *id.* § 11[2][a] ("Counsel may not avoid sanctions under the 'guise of pure heart and empty head.'"); Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil 2d* § 1335 (2d ed. 1990 & Supp.2002) (The 1983 version of Rule 11 "had been interpreted to require a showing of subjective bad faith by the signing attorney as an essential element of a violation. Since this proved to be a virtually unattainable standard, the rule was amended to employ a more objective standard.") ("The 1993 Amendment eliminates any possibility of reading the language in Rule 11 as establishing a subjective standard . . . ."). These treatises offer no support for the majority's holding in this case.

In my view, both the remainder of the paragraph in which the Show Cause Sentence appears and the Advisory Committee notes as a whole also demonstrate that the Show Cause Sentence should not be read to change the substantive standard governing any Rule 11 proceeding.

### The Pertinent Paragraph

The paragraph in which the Show Cause Sentence appears begins as follows: *"The power of the court to act on its own initiative is retained,* but with the condition that this be done through a show cause order." (Emphasis supplied.) Had the Advisory Committee intended to make a dramatic break with the state-of-mind requirement followed by the Supreme Court, *see Business Guides,* 498 U.S. at 551, 111 S.Ct. 922, and every one of the courts of appeals at the time of the 1993 amendments,[2] the Advisory Committee surely would have

---

**2.** "The Second Circuit was the first court of appeals to clearly embrace an objective standard. . . . By the end of 1986, all of the circuits had embraced an objective test." New York State Bar Committee on Federal Courts, *supra,* at 13 (cited in Advisory Committee

added the condition that the court must make a finding of subjective bad faith.[3] That same paragraph of the Advisory Committee notes did establish a procedural difference between motion-initiated and court-initiated sanctions and did impose restrictions on late-imposed sua sponte sanctions, but not the substantive differences identified by the majority. The Advisory Committee stated: "The revision provides that a monetary sanction imposed after a court-initiated show cause order be limited to a penalty payable to the court and that it be imposed only if the show cause order is issued before any voluntary dismissal or an agreement of the parties to settle the claims made by or against the litigant." This change, set forth expressly in the text of the revised rule, *see* Fed. R.Civ.P. 11(c)(2), responded to criticism of the 1983 version of Rule 11.[4]

Adoption of the safe harbor provisions affected the number of Rule 11 motions courts would have to decide; it did not affect the standards for finding a violation of Rule 11. If, as the majority holds, the Advisory Committee had meant to require subjective bad faith for court-initiated sanctions when counsel could not withdraw a submission under the safe harbor provision, section (b) of the rule would have said so. Instead, the limitations on court-initiated sanctions in the amended rule were expressly limited to the *type* of penalty that could be imposed and the *timing* of the sanctions order.

The reasons for these changes are apparent from the drafting history of Rule 11. In *Cooter & Gell,* the Supreme Court had rejected the argument that a district court lost jurisdiction to impose Rule 11

---

notes to 1993 amendment to Rule 11); *see also* Georgene M. Vairo, *Rule 11 Sanctions: Case Law Perspectives and Preventive Measures* § 5.02[b] at p. 5–7, 5–9 (2d ed.1995) (same) (earlier edition cited in Advisory Committee note to 1993 amendment to Rule 11); American Judicature Society, *Report of the Third Circuit Task Force, supra,* at 14 ("courts now generally agree that good faith is no longer a defense to Rule 11 sanctions") (cited in Advisory Committee notes to 1993 amendment to Rule 11); Jerold S. Solovy, et al., *Sanctions in Federal Litigation* 2–7 (1991) ("[E]very court of appeals that has considered the question has held that attorney conduct under the new Rule 11 is judged by an objective standard of reasonableness.").

**3.** I have found no commentator who suggests that the 1993 amendment imposed a heightened state-of-mind limitation on court-initiated sanctions under any circumstances. The 1993 amendment imposed "three limitations on sua sponte power—that the court must act through an order to show cause, that no monetary sanction is awardable unless the show cause order issued before the claims at issue were settled, and that any monetary sanction must be paid to the court ...." Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* 32 (3d ed.2000). "The principal purpose of erecting these three limitations on

sua sponte power was to reduce impediments to settlement." *Id.* at 318 (citations omitted).

**4.** *See* Advisory Committee on Civil Rules, *Interim Report on Rule 11* (April 9, 1991) ("Interim Report") (reprinted as Appendix I to Vairo, *Rule 11 Sanctions, supra* ). In its Interim Report, the Advisory Committee reported on the results of its July 1990 call for written comments on Rule 11, the empirical studies conducted by the Federal Judicial Center and submitted in early 1991, and a public hearing held in February 1991. The Interim Report notes that "[s]everal commentators did note, however, that settlements can be undermined by the imposition—or possibility of imposition—of sua sponte sanctions," *id.* at I–15, and that "special consideration should, perhaps, be given to the potential for unfairness caused by a court's sua sponte imposition of monetary sanctions after settlement of a case," *id.* at I–20. Apparently the Advisory Committee heard no similar concern about judges issuing Rule 11 sanctions using the same standards for motions and show cause proceedings, even if there is not opportunity to withdraw a submission, for there is no indication that the Advisory Committee ever considered the issue.

sanctions upon the voluntary dismissal of a case under Rule 41. 496 U.S. at 398, 110 S.Ct. 2447 ("We conclude that petitioner's voluntary dismissal did not divest the District Court of jurisdiction to consider respondent's Rule 11 motion."). That holding was criticized as discouraging voluntary dismissals because the act of voluntary dismissal itself might be seen as an admission that an action was frivolous.[5] Apparently the Advisory Committee heard no similar criticism of the objective standard for establishing a Rule 11 violation in situations involving any subset of court-initiated sanctions,[6] so it is difficult to imagine that the amended rule or the Show Cause Sentence reflect a response by the Advisory Committee to the problem that the majority in this case now perceives.[7]

Finally, although Rule 11 provides no safe harbor when a court issues a show cause order, the Advisory Committee did provide guidance that undercuts the majority's holding in this case. The last sentence of the paragraph of the Advisory Committee notes containing the Show Cause Sentence states that, although withdrawal of an offending submission would not entitle counsel to a safe harbor, "[s]uch corrective action, however, should be taken into account in deciding what—if any—sanction to impose if, after consideration of the litigant's response, the court concludes that a violation has occurred." The Advisory Committee gave no indication that the court should both consider any corrective action when choosing a sanction and also hold the conduct to the higher subjective bad faith standard when deciding whether a violation occurred.

---

**5.** As one commentator put it, under the 1983 version of Rule 11:

> Once a sanctions issue had been flagged, the judge was not merely empowered by the Rule to enter an award sua sponte, but was affirmatively required to impose a sanction if he or she concluded that a violation had occurred. Even the attempt to withdraw or settle a claim was viewed as evidence of culpability on the party of the alleged offender.

Joseph, *Sanctions, supra*, at 21 (citation omitted).

**6.** A review of each of the sources listed by the Advisory Committee in the second sentence of the Advisory Committee notes does not reveal a discussion of the need for a return to a bad faith standard when the safe harbor is not available. In addition, a May 1992 letter from Hon. Sam C. Pointer, Chairman of the Advisory Committee, summarizes the "extensive comment from the bench, bar, and public" concerning the proposed amendments adopted in 1993. *See* Letter from Hon. Sam C. Pointer, Chairman, Advisory Committee on Civil Rules, to Hon. Robert E. Keeton, Chairman, Standing Committee on Rules of Practice and Procedure (May 1, 1992), *reprinted in* 146 F.R.D. 519, 522 (1993) (hereinafter the

*"Pointer Letter"*). Judge Pointer outlined "the principal criticisms and suggestions" that the Advisory Committee received following a solicitation of public comments and a series of public meetings. *Id.* at 523–25. Of the twelve principal concerns Judge Pointer identified, only one dealt with court-initiated sanctions. That concern was entitled: "Court-initiated sanctions after case dismissed." *Id.* at 525. The discussion of that concern did not suggest that the Advisory Committee had received any comment concerning the appropriate *mens rea* standard for court-initiated sanctions under any procedural posture. *Id.*

**7.** It would be far different and far preferable to subject court-initiated sanctions orders to a somewhat heightened abuse of discretion review on appeal than to change the *mens rea* standard that the district courts are obligated to apply when deciding whether to impose sanctions in the first place. Indeed, this Court has already tightened its review of sanctions orders. "In a series of decisions issued in 2000, the Second Circuit has made it clear that the abuse-of-discretion standard in sanctions cases is not the 'light appellate touch' it is in other contexts." Joseph, *Sanctions, supra*, at 27 (Supp.2002) (citation omitted).

*The Advisory Committee Notes as a Whole*

Read in their entirety, the Advisory Committee notes to the 1993 amendment do not support the majority's holding. The notes begin with a statement of the purpose of the 1993 amendment: "to remedy problems that have arisen in the interpretation and application of the 1983 revision of the rule." The second sentence refers to "empirical examination of experience under the 1983 rule" and cites four reports by bar and judicial organizations and three "book-length analyses of the case law." The studies cited by the Advisory Committee show that courts initiated Rule 11 sanctions very rarely[8]—presumably, about as often as they imposed sanctions for contempt of court.

In the notes to subsections (b) and (c), the Advisory Committee wrote that the revised language of subsection (b)(2) "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." Although this comment specifically applies to subsection (b)(2), there is nothing in the notes that suggests an empty-head-but-pure-heart justification is otherwise permitted under the 1993 amendments, whether following a motion or a court-initiated proceeding, and whether or not counsel had an opportunity to withdraw the submission. To the contrary, the Advisory Committee explained that *"[w]hether a violation has occurred* and what sanctions, if any, to impose for a violation are *matters committed to the discretion of the trial court* ...." The standard announced by the majority will now restrict the discretion of the trial court, will inhibit the court's ability to police Rule 11 violations, and will encourage counsel to be less than complete in their investigation of the factual basis underlying submissions

to the court so that they can benefit from an empty-head-but-pure-heart defense—all in contravention of the guidance offered by the Advisory Committee in the notes to the 1993 amendment.

In addition, the 1993 amendments must be read in the context of the then existing rule. *Cf. Cooter & Gell*, 496 U.S. at 392, 110 S.Ct. 2447 ("An interpretation of the current Rule 11 must be guided, in part, by an understanding of the deficiencies in the [previous] version of Rule 11 that led to its revision."). In 1983, the drafters of Rule 11 abandoned the subjective bad faith standard that formerly governed Rule 11 sanctions. The Advisory Committee notes to the 1983 amendment to Rule 11 explain that the "standard is one of reasonableness under the circumstances. This standard is more stringent than the original good-faith formula and thus it is expected that a greater range of circumstances will trigger its violation." (Citations omitted.) And later: "The references in the former text to wilfulness as a prerequisite to disciplinary action has been deleted."

There are no similar statements in the 1993 Advisory Committee notes explaining a return to a bad faith standard in whole or in part. Moreover, the Advisory Committee notes to the 1983 amendment indicate that the 1983 amendment made "explicit" the power of the court to act sua sponte, "in order to overcome the traditional reluctance of courts to intervene unless requested by one of the parties. The detection and punishment of a violation of the signing requirement, encouraged by the amended rule, is part of the court's responsibility for securing the system's effective operation." As noted above, this power was "retained" following the 1993 amendments; by implication, the "responsibility" noted by the Committee in 1983

8. *See* note 1, *supra.*

was retained after 1993 as well. Both that power and the ability of the court to exercise that responsibility will be severely restricted by the majority's decision in this appeal.

Finally, the majority assumes that the Advisory Committee sought to protect *lawyers* from the imposition of sanctions when it drafted the safe harbor provisions of Rule 11. The evidence shows, rather, that the Advisory Committee sought to protect the *courts* from the burden of deciding numerous, often unnecessary, Rule 11 motions. Judge Sam C. Pointer, Chairman of the Advisory Committee, wrote a letter in May 1992 describing the work and conclusions of the Advisory Committee. In that letter, Judge Pointer never mentions the need to amend Rule 11, by incorporating safe harbor provisions or otherwise, to protect lawyers from sanctions,[9] yet he repeatedly mentions the manner in which the proposed amendments will reduce the number or frequency of Rule 11 motions.[10] As Judge Pointer noted, "[t]hese changes, coupled with the opportunity to correct allegations under the 'safe harbor' provisions, should eliminate the need for court consideration of Rule 11 motions directed at insignificant aspects of a complaint or answer." *Pointer Letter*, 146 F.R.D. at 524. The decision not to apply the safe harbor provisions of the amended rule to court-initiated sanctions proceedings reflects the obvious fact that courts do not need to be protected from matters that they raise on their own, only from unnecessary Rule 11 motions filed by counsel. This again suggests that the Show Cause Sentence represents an empirical statement; because judges will typically issue show cause orders only in the most serious situations[11]—those "akin to

---

9. One arguable exception appears in the sentence immediately following the quotation from Judge Pointer's letter included in the majority's opinion, in which Judge Pointer noted that a "litigant" would not be subject to a monetary sanction on the court's own motion after voluntary dismissal. That portion of the letter reads:

> The Advisory Committee continues to believe that court-initiated show cause orders—which typically relate to matters that are akin to contempt of court—are properly treated somewhat differently from party-initiated motions. *The published draft does, however, contain provisions in subdivision (c)(2)(B) protecting a litigant from monetary sanctions imposed under a show cause order not issued until after the claims made by or against it have been voluntarily dismissed or settled.*

*Pointer Letter*, 146 F.R.D. at 525 (emphasis supplied).

10. Among Judge Pointer's statements were the following: "[A]lthough the great majority of Rule 11 motions have not been granted, the time spent by litigants and the courts in dealing with such motions has not been insignificant." *Pointer Letter*, 146 F.R.D. at 523. The 1993 amendments were drafted "to deter presentation and maintenance of frivolous positions, while also reducing the frequency of Rule 11 motions." *Id.* "It is correct that, given the 'safe harbor' provisions and those affecting the type of sanction to be imposed, the amendment should reduce the number of Rule 11 motions and the severity of some sanctions." *Id.* "The Advisory Committee agrees with the premise that cost-shifting has created the incentive for many unnecessary Rule 11 motions ...." *Id.* at 524. "[T]he published draft provides the court with discretion to award fees to the prevailing party: this is needed to discourage non-meritorious Rule 11 motions ...." *Id.*

See also *Courts and Administrative Practice Subcomm. Hearing, supra*, at 38 ("Senator Heflin. 'On rule 11, what are the major problems that motivated the changes?' Judge Pointer. 'Too many rule 11 motions ....' ").

11. As Judge Pointer put it, sua sponte sanctions will *"typically relate* to matters that are akin to contempt of court." *Pointer Letter, supra*, 146 F.R.D. at 525 (emphasis supplied). Unlike counsel, who may have strategic reasons to bring unnecessary Rule 11 motions, district judges have no incentive to raise potential Rule 11 violations, except in the most egregious cases.

contempt"—providing a safe harbor procedure does not advance the goal of saving the courts from unnecessary Rule 11 burdens.

## Policy Considerations

The majority also asserts that changing the *mens rea* standard for a class of court-initiated Rule 11 sanctions is supported by policy considerations. Whether or not that is so, the Advisory Committee never considered, much less adopted, the majority's policy analysis. None of the Federal Rules of Civil Procedure has been subjected to greater debate, study or analysis than Rule 11. The rule thus reflects the considered judgment of the Advisory Committee and its efforts to balance competing interests, concerns and suggestions.

This panel should not substitute its judgment for that of the Advisory Committee.[12] As the Supreme Court has cautioned, "this Court is not acting on a clean slate; our task is not to decide what the rule should be, but rather to determine what it is.... Even if we were convinced that a subjective bad faith standard would more effectively promote the goals of Rule 11, we would not be free to implement this standard outside of the rulemaking process. 'Our task is to apply the text, not to improve upon it.'" *Business Guides*, 498 U.S. at 548–49, 111 S.Ct. 922 (quoting *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 126, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989)). Because the Advisory Committee never considered whether to revert to the pre–1983 subjective bad faith standard for any Rule 11 sanctions, this Court should not reimpose such a

standard even for a subset of Rule 11 proceedings.

## The Sanctions Decision

Judge Martin sanctioned Pennie & Edmonds for "making false statements of fact [on the basis of] an affidavit that any reasonable lawyer would recognize as perjury," *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 2002 WL 59434, at *6 (S.D.N.Y. Jan. 16, 2002), which is conduct akin to contempt in its egregiousness. The District Court found that "all of the facts available to Pennie & Edmonds should have convinced a lawyer of even modest intelligence that there was no reasonable basis on which they could rely on Mr. Brija's statements," *id.* at *8, which were the only support for certain statements in papers Pennie & Edmonds filed in opposition to the motion for summary judgment.

The majority is not entirely correct when it suggests that Judge Martin ordered Pennie & Edmonds to show cause why it should not be sanctioned under Rule 11 for "permitting Brija to submit a false affidavit." Judge Martin ordered Mr. Brija to show cause why he should not be held in contempt of court for "his repeated false statements under oath," *Patsy's Brand Inc. v. I.O.B. Realty, Inc.*, 2001 WL 170672, at *14 (S.D.N.Y. Feb.21, 2001), but also focused on Pennie & Edmonds' false representations in papers the firm submitted to the court. Specifically, after requiring I.O.B. and Mr. Brija to show cause why they should not be sanctioned, Judge Martin set out a separate paragraph in the order to show cause concerning Pennie & Edmonds:

---

**12.** Unlike the Advisory Committee, which solicited public comment and held public meetings at which it heard principally from the critics of the 1983 version of Rule 11, this panel has heard only one side of the story. Because the sanctions at issue were imposed without motion, there is no appellee in this appeal and thus no appellee's brief. Courts should exercise special caution when deciding important issues without the benefit of the full airing of the issues that results from the adversary process.

Rule 11 also imposes an obligation on counsel to make a reasonable inquiry to determine the accuracy of assertions made in motion papers. Here, as noted above, I.O.B.'s counsel asserted that I.O.B. had never claimed that it had used only one label from 1993 until the commencement of this action, and asserted that the label affixed as Exhibit I to Mr. Brija's affidavit of September 15, 2000, was created in 1993 or 1994. Given the fact that the former assertion was directly contrary to the facts of record, and that the latter assertion was patently false, ... I.O.B.'s counsel shall show cause ... why it should not be sanctioned under Rule 11 and 28 U.S.C. § 1927.

*Id.*

Pennie & Edmonds has not challenged any of the findings of fact made by the District Court when ruling on the sanctions issue. Thus, this Court must accept that the representations made by the firm were false and that it was objectively unreasonable for Pennie & Edmonds to rely on the Brija affidavit when making representations to the court. As Judge Martin observed, "In assessing Pennie & Edmonds' conduct, it is important to note that this is not a case where the client was telling a story for the first time and counsel had only vague suspicions that the client's assertions were not true. By the time Pennie & Edmonds took on the representation of I.O.B., a highly detailed affidavit of Mr. Brija had been conclusively proven to be false in very material respects, and had been disavowed by predecessor counsel who then withdrew from representing I.O.B." *Patsy's Brand,* 2002 WL 59434, at *7. The District Court also found that the investigation undertaken by Pennie & Edmonds revealed information that a reasonable lawyer would have interpreted as clearly undercutting its client's statements. Against this background,

Pennie & Edmonds' acceptance of its client's false statements was objectively unreasonable.

On the undisputed findings of fact in this case, I conclude that Pennie & Edmonds violated Rule 11. Judge Martin followed the procedures mandated by Rule 11, imposed a reasonable, non-monetary sanction, as permitted by the rule, and correctly applied the objective reasonableness test. Accordingly, I would affirm.

*Conclusion*

The majority opinion holds that courts must apply, in a subset of Rule 11 proceedings, a state-of-mind requirement that the Advisory Committee, the Supreme Court and Congress abandoned in 1983. In my view, the majority's interpretation is not supported by the text, Advisory Committee notes, drafting history or purpose of Rule 11. I therefore respectfully dissent.