# United States Court of Appeals

## For the First Circuit

No. 04-1334
No. 04-1360

LEISA YOUNG, individually and in her capacity as
Administratrix of the Estate of Cornel Young,

Plaintiff,

BARRY C. SCHECK; NICHOLAS BRUSTIN; ROBERT B. MANN,

Respondents, Appellants,

v.

CITY OF PROVIDENCE, by and through its Treasurer, Stephen
Napolitano; URBANO PRIGNANO, JR., individually and in his
official capacity as Providence Chief of Police; RICHARD
SULLIVAN, individually; JOHN RYAN, individually; KENNETH COHEN,
individually; MICHAEL SOLITRO, individually; CARLOS SARAIVA,
individually,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Judge,

Lynch and Lipez, Circuit Judges.

Stephen M. Prignano with whom Edwards & Angell, LLP was on
consolidated brief for appellants Barry C. Scheck and Nick Brustin.
Lynette Labinger with whom Roney & Labinger was on
consolidated brief for appellant Robert B. Mann.

Jametta Alston, President, Rhode Island Bar Association, Lauren E. Jones and Jones Associates on brief for Rhode Island Bar Association, Amicus Curiae.

Amy R. Tabor and Hardy Tabor & Chudacoff on brief for Rhode Island Chapter, American Civil Liberties Union, Amicus Curiae.

Theodore M. Shaw, Director-Counsel, Norman J. Chachkin and Miriam Gohara, NAACP Legal Defense & Educational Fund, Inc., on motion for leave to file brief and brief of NAACP Legal Defense & Educational Fund, Inc., Amicus Curiae.

---

April 11, 2005

---

**BOUDIN, <u>Chief Judge</u>**. In the course of a civil rights action, the district court determined that three attorneys for the plaintiff had violated Rule 11 of the Federal Rules of Civil Procedure. The court revoked the pro hac vice status of the two attorneys who were not members of the court's bar and formally censured one of the two. <u>Young</u> v. <u>City of Providence</u>, 301 F. Supp. 2d 187 (D.R.I. 2004). In this decision, we address appeals by all three attorneys; the merits of the civil rights action are the subject of the plaintiff's separate appeal resolved in our companion decision issued today <u>sub nom.</u> <u>Young</u> v. <u>City of Providence</u>.

The civil rights action grew out of a tragedy that occurred in January 2000 in Providence, Rhode Island. Two police officers (Michael Solitro and Carlos Saraiva), responding to the scene of a nighttime disturbance at a restaurant, shot and killed an off-duty officer--Cornel Young, Jr., who, with his weapon drawn, was attempting to assist them. In June 2001, Young's mother, acting on her own behalf and as executor of Young's estate, brought a civil rights action in district court asserting claims under section 1983, 42 U.S.C. § 1983 (2000), and under state law, against the city, various officials and the two officers.

The case, assigned to Judge Mary Lisi, was a complex one. This was due in part to the difficulty in reconstructing exactly what had happened in the nighttime encounter, in part to the

different tiers of liability asserted against various defendants (direct, supervisory and municipal) and in part to plaintiff's aim to show a pattern or policy of incompetent hiring and inadequate training. Both Barry Scheck and Nicholas Brustin of the New York firm of Cochran, Neufeld & Scheck LLP were admitted pro hac vice to represent the plaintiff; Robert Mann of the Providence firm of Mann & Mitchell acted as local counsel. Scheck was admitted, to replace his partner Johnnie Cochran, Jr., only in September 2003--shortly before a "phase I" trial was to begin focusing on the conduct of Solitro and Saraiva.

The litigation was the subject of extensive publicity; among other facets, the officers who fired the shots were white while Cornel Young was black (and the son of a senior Providence police officer). Scheck, who acted as lead counsel after his admission, was at odds with the district judge over various matters, including the division of the trial into two phases. Yet the incident that gave rise to the Rule 11 findings, censure and revocation of pro hac vice status was narrowly focused and arose against the following background.

By September 2003, extensive discovery had been conducted. One of the issues in the discovery, and in the ensuing trial, concerned the precise movements of Cornel Young and of Solitro. The former had been inside the restaurant; Solitro and Saraiva had approached the building through the parking lot to find

a man (later identified as Aldrin Diaz, who had caused an earlier disturbance) pointing a gun out of the window of a Chevrolet Camaro parked in the lot in front of the restaurant. Solitro broke cover and started toward the car. Young, moving to assist, emerged from the restaurant with his own weapon drawn and was shot by Solitro and Saraiva. Just where Young and Solitro had stood and moved had a bearing on who was at fault in the episode.

During discovery, Solitro had drawn a line indicating his own movement in relation to other physical landmarks including the Camaro; the line was drawn on a clear overlay laid atop a made-to-scale diagram prepared by the state attorney general in his own investigation. Scheck planned to rely importantly on the diagram in his opening to explain to the jury the defense version of what had happened. However, in September 2003, out-takes filmed by a local TV station on the night of the shooting became available and, from defense counsel's viewpoint, raised questions about the accuracy of the diagram--at least as to the location of the Camaro. Until then it had apparently been expected that both sides would agree to the admission of the diagram.

At the final pre-trial conference on September 19, 2003, the district court was told briefly that there was a dispute about the diagram. Defense counsel later recalled advising Brustin on September 25 or 26 of the specific discrepancy but Scheck later said that he did not fully understand the problem until October 7,

-5-

2003, when the jury was being selected. Defense counsel then told the district judge that the defense objected to the diagram as inconsistent with photographs made from the out-takes, and the judge responded that the parties should confer to see whether they could stipulate as to the matter. The judge told plaintiff's counsel: "If you can't agree to a stipulation on that, then I'm going to have to tell you to stay away from it because you're going to need testimony to explain it to the jury."

Scheck then offered as a compromise to stipulate that the diagram conflicted with photographs made from the film out-takes, but the next morning defense counsel declined the offer. Scheck again sought unsuccessfully to persuade the judge that he ought to be allowed to refer to the diagram in the opening. Then, with the opening statements about to begin, Scheck signed a stipulation drafted by defense counsel that the diagram was inaccurate as to the location of the Camaro and that the actual alignment of the car was as described in the stipulation. On this basis, Scheck was allowed to use the diagram in the opening, but he was not allowed thereafter to elicit testimony contradicting the stipulation.

Over the next several days of trial, further examination of the photographs persuaded Scheck and his colleagues that the out-takes did not contradict the diagram. A young associate at Scheck's firm was told to draft a memorandum to support a motion seeking relief from the stipulation on grounds of mistake. The

memorandum was filed with the court on October 16, 2003 in mid-trial, after being reviewed and then signed by all three counsel--Scheck, Brustin and Mann.[1]  That same morning the judge directed counsel to re-read the memorandum, saying that she was disturbed by representations made in the memorandum, "particularly as they relate to the actions of the court."

The memorandum, set forth in full at 301 F. Supp. 2d at 199-204, started with an introductory paragraph that conflated the earlier events by saying that counsel had believed prior to trial that the diagram could be used at trial and then continued:

> It was only on the eve of opening statements, once plaintiff had prepared her entire opening based on that stipulation, that defendants first said they would not stipulate to Exhibit 18, based on two new photographs they had found, Exhibits X and Y.  Plaintiff, moments before her opening, was informed by the Court she had to agree to defendants' stipulation. Plaintiff was genuinely confused about the import of photographs X and Y.  Plaintiff's opening relied critically on using that exhibit to explain events to the jury.  In this state of confusion and uncertainty, plaintiff felt little choice but to accept any stipulation defendant provided.

Id. at 200.

Thereafter, the memorandum provided a much more detailed recitation of events, together with legal arguments to justify relief from the stipulation entered into in such circumstances.

---

[1]A further version, correcting typographical errors, was filed later that day.  The differences between the two versions are not material to these appeals.

Later, the memorandum blamed defense counsel for rejecting Scheck's October 7 compromise stipulation, adding that "[u]nder the circumstances, plaintiff had no choice but to sign a stipulation without any chance to review the photographs at issue." Id. at 208. It there quoted a well known treatise that "'courts will look at the facts carefully to see that one litigant has not been coerced into the stipulation.'" Id. at 208 n.5 (quoting 22 Wright & Graham, Federal Practice and Procedure § 5194 (1978)).

After filing the motion and then hearing the judge's statement that she was disturbed by its representations, plaintiff's counsel returned to their office after the trial ended for the day and, assertedly unable to determine what had so troubled the judge, prepared a letter of general apology, which was immediately delivered to court. It apologized for any misstatement and said that "we do not seek to shift responsibility to the Court [for the stipulation], and if we have created a contrary impression, we are sorry." It did not withdraw any specific statement; plaintiff's counsel's position is that at that time they did not fully appreciate what had so concerned the district judge.

The following morning, during argument on the motion for relief from the stipulation, the judge made clear her view that "the reference [in the memorandum] to the Court instructing you that you had to stipulate is, again, a misrepresentation." Scheck now sought to explain that he had been misunderstood, but the judge

denied the motion for relief from the stipulation. Later that day the court called counsel before it and ruled that, based on the memorandum's misrepresentation, the pro hac vice admissions of Scheck and Brustin were revoked. Mann was directed to proceed to represent plaintiff at the trial. The trial proceeded to its completion and to a final judgment on February 12, 2004.

After the trial but before final judgment was entered, the district court on November 7, 2003, issued a show cause order to the three plaintiff's counsel. The order said that all three counsel had violated Rule 11(b)(3)[2] and directed the parties to show cause why sanctions should not be imposed. Counsel filed a memorandum and affidavits arguing that they had had no deceptive intent and that, read as a whole and in context, their memorandum asking to withdraw the stipulation had not misrepresented any facts. The Rhode Island Bar Association filed an amicus brief in support of the lawyers; the ACLU also sought unsuccessfully to do so.

On December 15, 2003, the district court held hearings on the show cause order, first agreeing to modify the show cause order to say only that it "appears" that plaintiff's counsel had violated

---

[2]This provision requires that in every pleading, or motion or other filing counsel's signature is a representation that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

Rule 11.  On February 11, 2004, the court issued an order finding that all three counsel had violated Rule 11.  In describing the background, the February 11 order pointed out that defense counsel's version of events suggested that plaintiff's counsel had enjoyed more detailed and specific warnings that the defense disputed the accuracy of the diagram than had previously been advertised.  However, the judge did not resolve any disputes on this score or rely upon such omissions in finding the Rule 11 violations.

Rather, the Rule 11 findings focused solely upon two specific "misrepresentations" in the memorandum: one was the above block-quoted language including the key statement that "[p]laintiff, moments before her opening, was informed by the Court she had to agree to defendants' stipulation."  301 F. Supp. 2d at 200.  The other was the statement that defense counsel "had no choice" but to sign the stipulation without any chance to review the photographs.  Id. at 208.  Both statements, said the court, falsely indicated that the court had ordered the stipulation to be signed; and, the court noted, the memorandum's references to injustice and coercion gave the impression that the court was responsible for such wrongs.

The court accepted that the memorandum had been drafted by a young associate and that plaintiff's counsel had denied instructing the younger lawyer to say that the court had directed

-10-

the stipulation. However, the court said that plaintiff's counsel were responsible under Rule 11 for statements made in a memorandum that they had reviewed and signed. Assessing relative responsibility, the court sanctioned Scheck by imposing "a public censure," 301 F. Supp. 2d at 198; Brustin, an associate whom the court said took direction from Scheck, was merely "admonished" to be more careful, id.; and as to Mann, whose role was ascribed to "inattention," id. at 199, the court said that his reputation in Rhode Island for integrity was well established and a sanction was unnecessary to deter repetition.

All three of plaintiff's counsel have appealed from the order determining that they committed Rule 11 violations, and Scheck and Brustin have asked that their censure and admonition be overturned and their pro hac vice status restored. In our view, the Rule 11 findings are appealable, being distinguishable from mere criticism, and, so too, the censure and admonition.[3] Nor is the request for reinstatement of pro hac vice status moot since the merits appeal in the civil rights action keeps alive the possibility of further district court proceedings. We turn, then,

_____

[3]Compare In re Williams, 156 F.3d 86, 92 (1st Cir. 1998) (holding that "a jurist's derogatory comments about a lawyer's conduct, without more, do not constitute a[n appealable] sanction"), with Precision Specialty Metals, Inc. v. United States, 315 F.3d 1346, 1351-52 (Fed. Cir. 2003) (distinguishing Williams where court found that attorney had violated Rule 11), and United States v. Talao, 222 F.3d 1133, 1137-38 (9th Cir. 2000) (distinguishing Williams where court found that attorney had violated ethical rule).

-11-

to the central issue--underlying all of the requests for relief-- whether the Rule 11 findings were justified.

The standard that applies on review of Rule 11 orders was established by the Supreme Court in 1990 and only recently glossed in our decision in <u>Obert</u> v. <u>Republic W. Ins. Co.</u>, 398 F.3d 138 (1st Cir. 2005). Formally, it is "abuse of discretion" as to either violation or sanction; but both a mistake of law and a clearly erroneous finding of fact constitute such an abuse. <u>Cooter & Gell</u> v. <u>Hartmarx Corp.</u>, 496 U.S. 384, 402 (1990). In this case, defense counsel make two principal arguments as to the Rule 11 findings: one relates to the substantive legal standard to be applied under Rule 11 where the court initiates the inquiry into a possible violation; the other is whether, under the proper standard, the objected-to statements violated Rule 11. We consider the issues in this order.

Rule 11(b) is not a strict liability provision. It prohibits filings made with "any improper purpose," the offering of "frivolous" arguments, and the assertion of factual allegations without "evidentiary support" or the "likely" prospect of such support. A lawyer who makes an inaccurate factual representation must, at the very least, be culpably careless to commit a violation. <u>See</u> Fed. R. Civ. P. 11(b) (requiring that factual contentions have evidentiary support only "to the best of the person's knowledge, information, and belief, formed after an

inquiry reasonable under the circumstances"). The question presented by plaintiff's counsel's first argument is whether something more than falsity and serious carelessness is required; counsel contend that where the court itself initiates the Rule 11 inquiry, the conduct must involve "situations that are akin to a contempt of court." The phrase is taken from an Advisory Committee's Note, to which we will return.

This distinction urged by plaintiff's counsel is at odds with the plain language of Rule 11. Rule 11(b), creating duties, sets out the substantive obligations of counsel (e.g., that factual claims must have evidentiary support or a likely prospect of it) without in any way suggesting that the substantive obligations differ depending on whether a later claim of violation is raised by opposing counsel or the court. Nor is it obvious why anyone would wish such duties governing "primary conduct" to depend on who might thereafter raise objections in a remedial proceeding. Cf. Commonwealth of Puerto Rico v. SS Zoe Colocotroni, 628 F.2d 652, 669 (1st Cir. 1980).

Rule 11(c), addressing sanctions, does distinguish between the procedures that apply depending on whether opposing counsel or the court initiates the charge. In the former case, there is a safe harbor opportunity to withdraw the objected-to statement within 21 days and thereby avoid sanctions; in the latter there is not. But the object of the safe harbor is to allow a party to

privately withdraw a questionable contention without fear that the withdrawal will be viewed by the court as an admission of a Rule 11 violation. Advisory Committee's Note to Fed. R. Civ. P. 11(b) and (c). Nothing in the language of Rule 11(c) says that, if the court initiates the inquiry, something more than a Rule 11(b) breach of duty is required.

The only hint of such a distinction as to the substantive standard appears in the Advisory Committee's Note, which explains the absence of a safe harbor for court-initiated inquiries as follows: "Since show cause orders will ordinarily be issued only in situations that are akin to a contempt of court, the rule does not provide a [comparable] 'safe harbor' [to withdraw the objected to statement]." This language has, indeed, been taken by several circuits as suggesting that only egregious conduct can be reached where the court begins the inquiry,[4] but we think mistaken any inference that this language requires malign subjective intent.

It is true that courts ought not invoke Rule 11 for slight cause; the wheels of justice would grind to a halt if lawyers everywhere were sanctioned every time they made unfounded objections, weak arguments, and dubious factual claims. Obert, 2005 WL 388302, at *7. However, this is an argument for requiring

---

[4]See Kaplan v. DaimlerChrysler, A.G., 331 F.3d 1251, 1255-56 (11th Cir. 2003); In re Pennie & Edmunds LLP, 323 F.3d 86, 90-93 (2d Cir. 2003); Hunter v. Earthgrains Co. Bakery, 281 F.3d 144, 151, 153 (4th Cir. 2002); United Nat'l Ins. Co. v. R & D Latex Corp., 242 F.3d 1102, 1115, 1118 (9th Cir. 2001).

-14-

_serious_ misconduct, whoever initiated the inquiry into a violation--not for distinguishing between the judge and opposing counsel. The "akin to contempt" language used by the Advisory Committee's Note may well have meant only that no safe harbor was needed _because_ judges would act only in the face of serious misconduct.

A specific purpose of the 1993 revision of Rule 11 was to reject such a bad faith requirement. _See_ Advisory Committee's Note saying that the amendments were "intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." Since then only one circuit court has read the present rule to require bad faith, _In re Pennie & Edmunds LLP_, 323 F.3d 86, 90-93 (2d Cir. 2003), and it did so in the teeth of a strong dissent, _id._ at 93-102. True, judges must be especially careful where they are both prosecutor and judge; but careful appellate review is the answer to this concern, whether the charge is negligence or deliberate dishonesty and whether it is contempt or a Rule 11 violation. If anything, opposing counsel has far greater incentive than the trial judge to invoke Rule 11 for slight cause.

We come, then, to the question whether the two objected-to statements in the memorandum were false and, if so, sufficiently careless to warrant sanction. The trial judge read both statements to suggest that the court had forced plaintiff's counsel to sign the stipulation. In our view, read as a whole, the memorandum

-15-

makes it clear that the judge did not require that the stipulation be signed but only said that a stipulation was a condition to use of the diagram in Scheck's opening statement--which is entirely accurate. There is some warrant for criticism of the memorandum but the central charge of falsity on which the Rule 11 findings rest cannot be sustained, so the issue of carelessness disappears.

The first paragraph of the memorandum (block-quoted above) did say that plaintiff was informed at the opening that "she had to agree to defendants' stipulation," omitting to add the phrase "in order to use the diagram in the opening argument." But the memorandum soon makes it explicitly clear that the judge required the stipulation <u>only in the sense that it was a condition of using the diagram in the opening</u>. Describing the events of October 8 after defense counsel rejected Scheck's stipulation, the memorandum states: "The Court instructed plaintiff again that the exhibit could be only used under stipulation."

As for the second quotation objected to by the judge--the statement that "plaintiff had no choice but to sign a stipulation"--the memorandum did not assert that the <u>judge</u> had directed Scheck to sign; indeed, the statement followed immediately after the memorandum's statement that defendants had rejected the Scheck stipulation "minutes before the opening" (in which, as the memorandum had already explained, the diagram was crucial to Scheck's planned presentation). "Forced" refers to these

circumstances and not to any directive from the judge that Scheck sign the stipulation.

The main problem in this memorandum is that in the introductory summary the drafter took as an unexplained premise what the lawyers and the judge full well knew:  that the judge had made clear, before the fatal stipulation was signed, that a disputed document could not be used in the opening argument absent a stipulation.  Yet, as we have just seen, even this premise is made explicit later in the memorandum.  The general rule is that statements must be taken in context, United States v. Moran, 393 F.3d 1, 16 (1st Cir. 2004), and that related parts of a document must be taken together, Nadherny v. Roseland Property Co., 390 F.3d 44, 49 (1st Cir. 2004).  That a hasty reader might take the first paragraph out of context is not in the present circumstances enough to brand the memorandum as false.

We are not suggesting that a deliberate lie would be immune to sanction merely because corrective language can be found buried somewhere else in the document.  But here the trial judge did not find, and in these circumstances could not have found, that defense counsel had intended to deceive.  The memorandum was drafted under pressure, by a younger lawyer not admitted as counsel in the case; and it was reviewed and signed by Mann, whose established reputation and integrity the opinion praises, and by Brustin, whose trial conduct is also approved of by the judge in

-17-

her decision.  Nor, of course, can anyone suppose that the judge would have been misled as to what she herself had earlier directed.

As it happens, the memorandum may otherwise have been misleading or inaccurate in certain of its detail.  If one accepts the account of defense counsel at the show cause hearing, the memorandum left out both the fact of prior warnings from defense counsel that they were concerned about the diagram and the fact that the photographs themselves were furnished to Brustin on September 25 or 26.  By omitting such detail, the memorandum enhances the "surprise" element tincturing the memorandum's gloss on the events of October 7 and 8 ("for the first time," "last minute choice").  Further, assuming that the photographs were provided on September 25 or 26, the memorandum's statement that the stipulation was signed "without any chance to review the photographs at issue" is doubtful; perhaps Scheck meant only that he had not focused on the issue but it would have been better to say that.

However, the district court made no definitive findings as to what warnings were given and when.  The basis for the Rule 11 charges was the suggestion that the judge had required the stipulation.  We also do not know how far defense counsel had gone, prior to receiving the out-takes, in leading plaintiff's counsel to believe that the diagram was common ground.  Nor can we tell how far Scheck was involved in trial preparations before his last-

-18-

minute pro hac vice appearance.  The final period before a large trial, like the trial itself, involves late nights, multiplying tasks and resulting confusions that are hard to imagine for one who has not experienced them.  The burden upon the trial judge is scarcely less.

The district judge is well known for both patience and care.  It is easy to imagine why, in the course of a tense and contentious trial, she was greatly displeased at a document, emblazoned with references to injustice, that could be publicly read as blaming the trial judge for what had patently been plaintiff's counsel's own miscalculation.  But on a close reading and a consideration of all the circumstances, the memorandum taken as a whole did no more than say, albeit inartfully, that the trial judge had required the stipulation to be signed as a condition of using the diagram in the opening.

Accordingly, the findings that plaintiff's counsel violated Rule 11 cannot stand; and, as those findings are the only grounds for the censure, admonition and revocation of pro hac vice status, they too must be undone.  The findings of Rule 11 violations are <u>set aside</u>, the sanction and admonition are <u>vacated</u>, and the pro hac vice status of Scheck and Brustin is <u>restored</u>.  No costs.

<u>It is so ordered</u>.