**In re M.A.S. REALTY CORPORATION,**
**Debtor.**

No. 02–46121(JBR).

United States Bankruptcy Court,
D. Massachusetts.

June 13, 2005.

John A. Burdick, Jr., Worcester, MA, for Debtor.

### MEMORANDUM OF DECISION

JOEL B. ROSENTHAL, Bankruptcy Judge.

This matter is before the Court on Debtor M.A.S. Realty Corporation's ("M.A.S." or the "Debtor") Motion for Sanctions [Docket # 300] and the Opposition of North Shore Renewal, Inc. ("N.S.R.I."), Elaine Yellin, Stephen Yellin, Louis S. Robin and Melvin S. Hoffman thereto [Docket # 327]. The Court held a non-evidentiary hearing on November 5, 2004, and took the matter under advisement.[1] In an Order dated December 22, 2004, the Court denied the Motion for Sanctions with respect to Elaine Yellin and Melvin Hoffman [Docket # 375]. With respect to Stephen Yellin and Louis Robin, the Court found that the moving party "met its initial burden by showing that such violations occurred and that sanctions are warranted" and that the burden "shifted to Attorneys Robin and Yellin to detail facts they believe will warrant denial of the Rule

---

1. At the conclusion of said hearing, all parties represented that they were satisfied with the evidence on the record. No party requested an evidentiary hearing at that time.

9011 Motion." *Memorandum of Decision, p. 9* [Docket # 374]. In response, Attorneys Robin and Yellin filed affidavits explaining why they believed sanctions should not be imposed on them. Based on these affidavits, the Court declined to impose sanctions on Attorneys Robin and Yellin, finding that their actions were "marginally reasonable under the circumstances." [Docket # 401].

In response, the Debtor filed a Motion to Reconsider the Court's Order denying the Debtor's Motion for Sanctions [Docket # 403]. As the Debtor had not been given an opportunity to respond to the affidavits, the Court vacated its Order denying sanctions and held an evidentiary hearing to determine whether sanctions should be imposed against Attorneys Robin and Yellin.

## BACKGROUND

The underlying dispute arose out of the Debtor's alleged breach of a prepetition Purchase and Sale Agreement (the "P & S") whereby N.S.R.I. was to purchase the Debtor's property located in Fitchburg, Massachusetts (the "Nockege Mill Property"). On October 7, 2002, a week after the P & S was signed, the Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. It is undisputed that N.S.R.I. was not listed as a creditor and did not receive notice of the bankruptcy until some time after the filing.

In accordance with the terms of the P & S, N.S.R.I. deposited $100,000.00 into escrow (the "Deposit"). N.S.R.I. could then extend the closing date beyond January 30, 2003 in 30–day increments, up to a total of four times, by giving the Debtor written notice of each extension. Upon each such extension, the purchase price would be increased by $50,000.00 and the

Debtor would be entitled to withdraw and use for its own purposes, free of restrictions, $10,000.00 of the Deposit. N.S.R.I. exercised its right to all four extensions.

At some point N.S.R.I. assigned the P & S to another entity, Nockege Mill LLC, which executed the First Amendment to the P & S on May 8, 2003.[2] Under the First Amendment, the closing date could be extended an additional four times on the same terms contained in the P & S. If all extension options were exercised, the closing would take place on September 30, 2003, with the remaining $20,000 of the Deposit to be credited to the purchase price. *Agreed Exhibits, Exhibit 7.* All four options were exercised.

On September 30, 2003, Nockege Mill LLC, through Attorney Sarah Ruth Evans, wrote a letter to M.A.S.'s attorney, Steven Weiss, seeking to extend the closing date to December 31, 2003 at 12:00 p.m. *Letter of Sarah Ruth Evans, Agreed Exhibits, Exhibit 9.* M.A.S., through Attorney Weiss, agreed by letter on October 3, 2003. Attorney Weiss's letter also contained the following language: "in particular, this letter will confirm that, as consideration for further extensions of the Purchase Agreement, our client may utilize $10,000 of the deposit each month as payment for the extension option, with such amounts being credited to the purchase price at closing." *Letter of Steven Weiss, Esq., Agreed Exhibits, Exhibit 10.* Moreover, Attorney Weiss stated that he would be "drafting the documents necessary to obtain Bankruptcy Court approval for the sale..." *Id.*

On the same day, N.S.R.I.'s real estate attorney, Steven Wilchins, responded, stating that Attorney Weiss's letter informed his client "for the first time[,] that M.A.S.

---

**2.** The Debtor did not seek Bankruptcy Court authority to enter into the First Amendment to the P & S.

Realty Corporation is the debtor in a Chapter 11 proceeding." *Letter of Steven Wilchins, Esq., Agreed Exhibits, Exhibit 11.* In this letter Attorney Wilchins did not object to the terms set forth in Attorney Weiss's October 3, 2003 letter, but stated that "if the Bankruptcy Court does not approve this transaction or the transaction is negatively affected in any other way by the Chapter 11 proceeding, Nockege will employ all legal means at its disposal to protect its rights and recover its damages." *Id.* On October 30, 2003, the Debtor filed a Motion to Sell the Nockege Mill Property to Nockege Mill LLC. [Docket # 101]. Shortly thereafter, the P & S was assigned back to N.S.R.I.

Attorney Louis Robin was contacted by Stephen Yellin, an attorney married to the president of N.S.R.I., in early November 2003 and shortly thereafter was retained as counsel to N.S.R.I. Robin and Yellin discussed various matters, including the expenses incurred by N.S.R.I. as a result of the Nockege Mill deal. On December 5, 2003, Attorney Robin filed an Objection to the Debtor's Motion to Sell the Nockege Mill Property [Docket # 126], seeking damages in excess of $600,000.00.[3] The Objection alleged, *inter alia,* the following:

> From the execution of the P & S Agreement until September 30, 2003 (when North Shore was notified of the Chapter 11 by Massachusetts Housing Financing Agency), in addition to the $80,000.00 released from the deposit, North Shore and its associates incurred over $600,000 to prepare for the purchase and anticipated construction (i.e., architect's fees, engineer expenses, legal and accounting

expenses, survey fees, and related expenses). *Objection by Interested Party North Shore Rental, Inc.,* ¶ 8.

The Objection also alleged that the Debtor's bankruptcy was one of the principal reasons N.S.R.I. was "unable to meet the financing contingencies in the P & S." *Id.* at ¶ 9. No supporting documentation other than a summary of the alleged expenses was attached to N.S.R.I.'s Objection. After a hearing, the Court approved the sale motion [Docket # 127]. Nevertheless, the closing did not occur on December 31, 2003 because N.S.R.I. "was unable to obtain development financing in a sum sufficient to complete the project." *Objection by Debtor to Claim of North Shore Renewal, Inc.,* ¶ 26 [Docket # 208].

On May 3, 2004, five months after the closing was scheduled to take place, Attorney Robin, on behalf of N.S.R.I., filed a proof of claim in the Debtor's case. The claim was executed by Elaine Yellin in her capacity as President of N.S.R.I.[4] and filed by Attorney Robin. The Claim alleged that N.S.R.I. had incurred damages in the amount of $605,334.14 (including $235,000 in "Overhead") as a result of the Debtor's alleged breach of the P & S. Again, no documents other than a summary of expenses were attached to support N.S.R.I.'s asserted damages. The parties do not dispute that on or about May 26, 2004, approximately three weeks after Attorney Robin filed the proof of claim, Attorney Weiss sent him a letter stating that there was no basis or support for N.S.R.I.'s claim that it had been damaged in an amount exceeding $600,000.00. Attorney

---

3. N.S.R.I.'s Objection referred to a summary of the expenses allegedly incurred, which was purported to be attached to the Objection as Exhibit A. In fact, no Exhibit A was filed by N.S.R.I. and when asked about it at the evidentiary hearing, Attorney Robin could not produce it.

4. This Court previously found that Mrs. Yellin executed this document at the direction of her husband and lacked personal knowledge of the contents of the document.

Weiss further requested that Attorney Robin withdraw the claim with prejudice and threatened to "seek sanctions against all parties connected with the filing of the Claim, pursuant to Bankruptcy Rule 9011" if the claim was not withdrawn within seven days from the date of the letter. *Motion for Sanctions, Exhibit A* [Docket # 300]. Attorney Weiss's letter was neither admitted into evidence nor was it made part of the evidentiary record in this contested matter. The proof of claim was neither amended nor withdrawn and no supporting documents were provided.

The Debtor filed an Objection to N.S.R.I.'s proof of claim on June 22, 2004 [Docket # 208], and the Court scheduled an evidentiary hearing. Also on June 22, 2004, the Debtor filed a Motion for 2004 Examination of N.S.R.I. and related parties [Docket # 210] in which the Debtor sought to examine parties who had information pertaining to the proof of claim. Attorney Robin, on behalf of N.S.R.I., then filed a Motion for Payment of Administrative Claim on June 24, 2004 [Docket # 213], alleging that the Debtor's failure to inform it of the Chapter 11 proceeding constituted a breach of the P & S. Attorney Robin testified that in July 2004 he spoke with Debtor's counsel who informed Attorney Robin that the Debtor would seek Rule 9011 sanctions if the proof of claim was not withdrawn; Attorney Robin's response was that Debtor's counsel should "[d]o what you have to do." *Transcript of March 13, 2005 Evidentiary Hearing,* p. 127, Line 4. On August 24, 2004, N.S.R.I. filed another Motion for 2004 Examination [Docket # 248].

On August 25, 2004, just five days prior to the evidentiary hearing on the Objection to N.S.R.I.'s claim, Attorney Hoffman joined Attorney Robin as co-counsel for N.S.R.I. An amended claim in the reduced amount of $274,396.98 was filed promptly. The amended proof of claim reduced the total expenses allegedly incurred from many of the categories listed in the original proof of claim and eliminated entirely the "Overhead" expenses. The amended proof of claim was filed by Attorney Hoffman and executed by Elaine Yellin in her capacity as President of N.S.R.I. Again Mrs. Yellin affixed her signature without personal knowledge, relying on her husband's representations in signing the amended claim.

On August 30, 2004, at the conclusion of the evidentiary hearing on the amended claim, the Court sustained, in part, the Debtor's objection because N.S.R.I. "has not proved that it holds any claim beyond a potential claim for return of its deposit." [Docket # 274].[5] N.S.R.I. introduced no testimony even hinting that the Chapter 11 filing was the cause of N.S.R.I.'s inability to obtain financing. To the contrary, N.S.R.I. stated its desire to go forward even after it learned of M.A.S.'s bankruptcy because it believed the sale to be a good deal.

At various points during his representation, Attorney Robin had conversations with Attorneys Wilchins, Yellin and Mikels, and with Genarro Perotta.[6] Prior to filing the Objection to the Debtor's Motion to Sell in December 2003, Attorney Robin spoke with Attorney Wilchins, who expressed his opinion that the expenses incurred in connection with the transaction

---

5. The Court took the issue of whether N.S.R.I. was entitled to return of the Deposit or any portion of the Deposit under advisement and ultimately sustained the Debtor's objection to that part of the claim as well.

6. Mr. Perotta served as Operations Manager of Algen Construction and Development, which worked with N.S.R.I. to finance the closing.

were legitimate and significant. *Affidavit of Louis Robin,* p. 3. The $600,000 figure itself was supplied to Attorney Robin by Stephen Yellin. *Id.* In addition to discussing the reasonableness of the alleged damages with other attorneys, Attorney Robin had a meeting with Genarro Perotta on December 11, 2003, during which Mr. Perotta repeated that the expenses were "reasonable" and would not have been incurred "but for the Nockege Mill project." *Id.* at 4. No documents evidencing the damage were produced to Attorney Yellin, however. In late April of 2004, prior to the filing of the proof of claim, Stephen Yellin repeated to Attorney Robin that the alleged damage figure was valid and accurate. *Id. at 5.* Still no documents were provided. Also in April 2004, Attorney Robin had a conversation with Attorney Richard Mikels, who communicated his opinion that "Stephen Yellin was a reputable real estate person, had significant interests, was most competent, and was 'hands on' " and that Mr. Yellin "understood the responsibilities of all parties and attorneys, and would not assert any claim that was not reasonably based." *Id. at 5.* After the filing of the proof of claim, yet prior to the non-evidentiary hearing on the Debtor's Objection to N.S.R.I.'s proof of claim, Attorney Robin again contacted Algen requesting documentary backup to the proof of claim, to which Algen again gave an assurance that it had "volumes of documents supporting the non-overhead expenses." *Id. at 6.* Between July 29 and August 13, 2004. Attorney Robin "was constantly contacting Algen concerning the documents that they had promised." *Id. at 7.* Finally, when no documents were submitted by August 23, 2004, the decision was made to amend the proof of claim. *Id. at 8.* On September 1, 2004, following the Court's ruling that N.S.R.I. had no claim beyond a potential claim for return of its Deposit, the Debtor served its Motion for Sanctions on Attorneys Robin and Yellin, Elaine Yellin and Melvin Hoffman. On September 23, 2004, the Debtor filed its Motion for Sanctions with the Court [Docket # 300]. In addition to denying that their behavior violated Rule 9011, the parties who were and are the subject of the motion, argued that the motion was procedurally defective, as it was brought after the adjudication of the proof of claim.

## DISCUSSION

Bankruptcy Rule 9011 provides, in relevant part, as follows:

(a) Signature

Every petition, pleading, written motion and other paper, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name. A party who is not represented by an attorney shall sign all papers. Each paper shall state the signer's address and telephone number, if any. An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.

(b) Representations to the Court

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or rever-

sal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support, or if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(c) Sanction

If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) How Initiated.

(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such period as the court may prescribe), the challenged paper, claim, defense, contention, allegation or denial is not withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b). If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.

(B) On Court's Initiative. On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.

(2) Nature of Sanctions; Limitations. A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations of subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary value, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

 The imposition of sanctions under Rule 9011 is a very serious matter. The decision regarding whether they should be imposed requires a great deal of thought and care. Only those actions deemed to fall squarely within the purview of Rule 9011 will result in a finding that it has been violated and the concomitant imposition of sanctions by this Court. *In re 680 Fifth Avenue Associates*, 218 B.R. 305, 312 (Bankr.S.D.N.Y.1998).

 The purpose of Rule 9011 is to deter baseless filings in bankruptcy and thus avoid the expenditure of unnecessary resources by imposing sanctions on those found to have violated it. *In re Deville*, 280 B.R. 483, 492 (9th Cir. BAP 2002) ("Rule 9011, like its counterpart Federal Rule of Civil Procedure 11, is designed to encourage counsel (and parties) to avoid groundless filings or filings filed for im-

proper purposes, largely through the imposition of sanctions."); *In re Kilgore*, 253 B.R. 179, 192 (Bankr.D.S.C.2000) ("[T]he primary purpose of Fed. R. Bankr.P. 9011 is to deter future abuse of the judicial process."). A court is given discretion in deciding whether it is appropriate to impose sanctions, and if the statute is found to have been violated, the Court must limit the amount imposed to "what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Bankr.P. 9011(c)(2); *Arcari v. Marder*, 225 B.R. 253, 257 (D.Mass. 1998).

■ The standard applicable to an "attorney or unrepresented party" under Rule 9011(b) is objective and hinges on whether an "inquiry reasonable under the circumstances" was undertaken prior to the filing of a pleading. Fed. R. Bankr.P. 9011(b). The text of Rule 9011(b) does not limit responsibility to documents actually signed, but rather expressly extends an affirmative duty to presentations made "to the court (whether by signing, filing, submitting, or later advocating)..." *Id.* While the text of Rule 9011 would appear to limit its applicability to "an attorney or unrepresented party," Fed. R. Bankr.P. 9011(b), the case law has construed Fed.R.Civ.P. 11, the counterpart of Bankruptcy Rule 9011 and whose relevant language is identical to that of Rule 9011, more broadly, holding that an attorney, a represented party or both may properly be subject to Rule 11's purview.[7] *Business Guides v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 550, 111 S.Ct. 922, 932,

112 L.Ed.2d 1140 (1991) ("[W]here a represented party appends its signature to a document that a reasonable inquiry into the facts would have revealed to be without merit, we see no reason why a district court should be powerless to sanction the party in addition to, or instead of, the attorney."). A represented party, like an attorney, is held to a standard of objective reasonableness. *Id.* at 551, 111 S.Ct. 922 ("[W]e hold that [Rule 11] imposes on any party who signs a pleading, motion, or other paper—whether the party's signature is required by the Rule or is provided voluntarily—an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and that the applicable standard is one of reasonableness under the circumstances.").

■ In addition to the substantive standard set forth *supra*, the Rule carries a procedural requirement. Rule 11 was amended in 1993 to include a 21-day "safe harbor" provision with respect to motions filed by parties. Fed.R.Civ.P. 11(c)(1)(A). The safe harbor provision must be strictly complied with in order for sanctions to be imposed under the amended Rule. *In re Sammon*, 253 B.R. 672, 678 (Bankr.D.S.C. 2000).[8] Under the safe harbor provision, a party seeking sanctions must serve its motion on the opposing party and may file the motion with the court 21 days later only if the challenged pleading is neither withdrawn nor corrected within that time. The purpose is to give parties against whom the motion is directed an opportunity to remedy the alleged wrongs. *Id.* at 679. *See also Young v. City of Provi-*

---

7. In determining whether the imposition of sanctions is appropriate in this case, the Court may look to authorities interpreting Fed.R.Civ.P. 11 as a guidepost. *In re CK Liquidation Corp.*, 321 B.R. 355 (1st Cir. BAP 2005), *citing In re D.C. Sullivan Co.*, 843 F.2d 596, 598 (1st Cir.1988) ("Because Rule 9011 is derived from Federal Rule of Civil Proce-

dure 11, the First Circuit has explained that 'Rule 11 jurisprudence is largely transferable to Rule 9011 cases.'").

8. Fed. R. Bankr.P. 9011 was amended in 1997 to conform it to the 1993 Amendments to Fed.R.Civ.P. 11.

*dence,* 404 F.3d 33, 39 (1st Cir.2005) ("[T]he object of the safe harbor is to allow a party to privately withdraw a questionable pleading without fear that the withdrawal will be viewed by the court as an admission of a Rule 11 violation."). To that end, a motion filed after a judgment has been entered is procedurally defective. *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.,* 369 F.3d 385, 389 (4th Cir.2004) ("[F]ailure to comply with the procedural requirements precludes the imposition of the requested sanctions."); *In re Pennie & Edmonds LLP,* 323 F.3d 86, 89 (2d Cir.2003) ("[T]he 'safe harbor' provision functions as a practical time limit, and motions have been disallowed as untimely when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission"); *Ridder v. City of Springfield,* 109 F.3d 288, 295 (6th Cir.1997) ("[A] party cannot wait to seek sanctions until after the contention has been judicially disposed. A party must now serve a Rule 11 motion on the allegedly offending party at least twenty-one days prior to conclusion of the case or judicial rejection of the offending contention.... Any other interpretation would defeat the rule's explicit requirements.").

■ In this case, the Court finds that the "safe harbor" provision of Fed. R. Bankr.P. 9011(c)(1)(A) was not satisfied. It is undisputed that the Motion for Sanctions was not served on Attorneys Robin and Yellin, Elaine Yellin and Melvin Hoffman until September 1, 2004, at which

point the Court had already adjudged that N.S.R.I. had "not proved that it has any claim beyond a potential claim for its Deposit." By waiting until after the judgment entered to file its motion for sanctions, the Debtor essentially rendered the safe harbor a nullity.[9]

■ The Court recognizes that Attorney Weiss's letter of May 26, 2004 provided N.S.R.I. with notice of the Debtor's intention to seek sanctions pursuant to Rule 9011 should N.S.R.I. refuse to withdraw the $605,334.14 proof of claim.[10] Indeed, some courts have deemed a warning letter sufficient to meet the requirements of the safe harbor provision, holding that technical noncompliance with the statute will not necessarily bar an otherwise culpable party from being sanctioned. *Nisenbaum v. Milwaukee County,* 333 F.3d 804, 808 (7th Cir.2003); *Cardillo v. Cardillo,* 360 F.Supp.2d 402, 419 (D.R.I.2005). In this case, however, the Court is unable to adopt such a reading, as the May 26, 2004 letter was neither admitted into evidence nor otherwise made part of the record in this contested matter. Instead, it was simply included as an exhibit to the Debtor's Sanctions Motion.[11] As it is well settled that pleadings are not evidence, *In re S.N. Brown Elec. Corp.,* 136 B.R. 598, 601 (Bankr.D.Mass.1992), the aforesaid decisions are thus distinguishable from the instant case. Moreover, even if the Court were to consider the letter, the Court, under these facts, cannot find the statement that the Debtor would seek sanctions

---

**9.** The Court acknowledges that its ruling today renders improvident its finding of December 22, 2004 that the "moving party has met its initial burden by showing that such violations occurred." *Memorandum of Decision,* p. 9.

**10.** The Overhead portion of the proof of claim, which the Debtor found most offensive, was in fact withdrawn, albeit belatedly. The

Court's decision on the merits was based on who held the claim and in what amount, not on whether the claim existed.

**11.** The Court notes that M.A.S.'s attorney, Edward Sabella, referred to Attorney Weiss's letter at the November 5, 2004 nonevidentiary hearing. He did not, however, attempt to admit it into evidence.

pursuant to Rule 9011 so unambiguous as to put the parties on notice that the letter was the equivalent to the required motion.

Although the procedural defect was raised by the parties against whom sanctions were sought, the Debtor did not address the safe harbor provision in any of its written submissions. The Debtor did attempt to address it, however, at the November 5, 2004 nonevidentiary hearing, suggesting that the Court *sua sponte* issue an order to show cause why sanctions should not be imposed pursuant to Rule 9011(c)(1)(B) should it find the Debtor's motion to be procedurally deficient.[12] The Court declined to exercise its *sua sponte* powers at that time and similarly declines to do so today.

The Debtor also argued at the same hearing that the safe harbor provision should not be applied to it because N.S.R.I.'s frivolity was not revealed until completion of the 30–day expedited discovery period. According to the Debtor, this left insufficient time to serve its Motion for Sanctions on N.S.R.I. The Court finds this arguments unpersuasive. First, the Court finds the Debtor's contention that the frivolity was not revealed until completion of the discovery period not credible. The Debtor clearly had a strong suspicion that N.S.R.I.'s proof of claim was frivolous, and wrote a letter threatening to seek sanctions if the proof of claim was not withdrawn. Following delivery of this letter, the Debtor had over two and a half months to file its Motion for Sanctions yet failed to do so. Second, even if the extent of N.S.R.I.'s alleged frivolity was not revealed until shortly before the August 30, 2004 evidentiary hearing, the Debtor had

several options. It could have filed a motion asking that the Court issue an order to show cause under Rule 9011(c)(1)(B) and set forth with specificity why it was necessary for the Court to act.[13] It could have requested that the hearing be continued. It could have asked the Court to refrain from entering a judgment on the Deposit issue for 21 days in order to give the parties against whom sanctions were being sought the opportunity to amend or withdraw the claim. The Debtor failed to avail itself of any of these options, instead waiting until it was too late for the parties against whom sanctions were being sought to take corrective action. Consequently, the Debtor's failure to comply with the Rule's procedural confines deprived the opposing parties the benefit of the safe harbor, which precludes this Court from imposing sanctions. To rule otherwise would effectively render Rule 9011(c)(1)(A) meaningless.

The Sanctions Motion's procedural deficiencies are regrettable, as the Court believes that both Attorneys Robin and Yellin acted unreasonably under the circumstances and thus would be subject to sanctions but for the Debtor's failure to comply with Rule 9011(c)(1)(A).

Attorney Robin first alleged that N.S.R.I. was damaged in an amount exceeding $600,000.00 for the first time on December 5, 2003 in his Objection to the Debtor's Motion to Sell the Nockege Mill Property. He signed the Objection yet included no documentation that would support the assertion that N.S.R.I. had been damaged in such an amount. Attorney Robin also alleged in the Objection

---

12. The text of the Rule and the authorities interpreting it make clear that the 21–day safe harbor provision does not apply to court initiated orders. Fed. R. Bankr.P. 9011(c)(1)(B); *In re Melendez,* 235 B.R. 173, 201 (Bankr. D.Mass.1999).

13. The Debtor urged Court action at the nonevidentiary hearing only after it recognized the procedural defects inherent in the timing of its motion.

that the Debtor's Chapter 11 filing rendered N.S.R.I. unable to timely meet its financing contingencies as set forth in the P & S. No evidence of N.S.R.I.'s inability to secure financing due to the Chapter 11 filing was introduced at that, or indeed, at any time.[14] All that was attached to the Objection was a rudimentary summary of expenses incurred. Attorney Robin's filing of an Objection containing such allegations absent corroborating documentation itself constituted questionable conduct. Nevertheless, the fact that the $600,000.00 damage figure was first introduced on December 5, 2003 absent supporting documentation and then reiterated in the proof of claim nearly five months later, again without corroboration, was clearly unreasonable. As such, even if he did not have sufficient time to conduct an investigation prior to filing the Objection to the Motion to Sell in December 2003, he had five months thereafter to verify the accuracy of the alleged damages and to provide backup documentation with the proof of claim. He failed to do so.

■ The Court recognizes Attorney Robin's persistence in asking Attorney Yellin and Genarro Perotta for documentation that would corroborate the damages alleged. Nevertheless, the fact that these efforts did not yield a single supporting document either before or during the five-month period from December 5, 2003 through May 3, 2004 should have alerted Attorney Robin that the proof of claim lacked a reasonable evidentiary basis, which in turn should have made him realize the impropriety of filing the proof of claim itself. The Court finds that Attorney Robin's filing of a proof of claim in the amount of $605,334.14 without evidentiary support and based solely on the empty words of Yellin and Perotta when he had

five months during which he could have and should have undertaken a prefiling investigation was unreasonable under the circumstances.

■ Like Attorney Robin, Attorney Yellin had several months to verify the accuracy of the damages alleged in the proof of claim. Even if his actions were reasonable at the time he caused his unwary wife to sign the offensive pleading, and this Court believes they were not, Attorney Yellin was subject to a continuous and ongoing duty to reassess this act and, like Attorney Robin, to take corrective action should it become objectively reasonable to do so. At any point thereafter, Attorney Yellin could have undertaken such remedial measures, yet he continued to unreasonably press N.S.R.I.'s inflated claim.

Further, it is uncontroverted that Mr. Yellin played a central role in numerous aspects of this case. First, when Attorney Robin was retained as counsel to N.S.R.I., it was Mr. Yellin who contacted him, and the two then proceeded to discuss various matters, including the expenses allegedly incurred by N.S.R.I. as a result of the Nockege Mill deal. The decision to take the case and actions subsequently undertaken by Attorney Robin were based, at least in part, on these and later conversations. Second, Mr. Yellin, who possessed a law degree and was a licensed member of the Bar at all relevant times, expressly held himself out to the Debtor as an attorney representing N.S.R.I. during the relevant period. *Letter of Stephen I. Yellin, Agreed Exhibits*, Exhibit 17. This letter included the heading "Stephen I. Yellin, Attorney at Law" and expressly stated that he "represent[s] North Shore Renewal, Inc." *Id.* Mr. Yellin's own words demonstrate that he acted in a representative

---

14. The Court later found this argument to be patently false. *Memorandum of Decision Re: Request for Payment of Administrative Claim*

*(At Least in Part) and Determination of Balance of Claim*, p. 6 [Docket # 372].

capacity in this matter when it suited him so to do. More importantly, he unreasonably caused his wife to provide her signature as a direct result of his own advice and assurances. Consequently, although Mr. Yellin neither filed nor signed any offensive pleadings, he caused an objectively unreasonable pleading to be filed and signed, thereby bringing him within the purview of Rule 9011(b). Under these circumstances, Mr. Yellin could not extricate himself from his status as a member of the Bar and the concomitant ethical obligations pertaining thereto.

Even if the Court ignores Mr. Yellin's status as a licensed member of the Bar, his central role in the violation of Rule 9011(b) would render him liable as a represented client. In addition to causing his wife to sign the offensive pleading, it is uncontroverted that Mr. Yellin played an integral role in N.S.R.I.'s business affairs. He communicated directly with Mr. Perotta both before and after the initial proof of claim was filed. Mr. Yellin also testified before this Court that "I basically act as the CEO [of N.S.R.I.]. I make all the small decisions and discuss the major decisions with my wife." *Transcript of August 30, 2004 Evidentiary Hearings, p. 32. lines 5–6; Transcript of March 14, 2005 Evidentiary Hearing. p. 156, line 15 and p. 157, line 9.* Mr. Yellin's own words indicate to the Court that his central role in the business, combined with his extensive experience and expertise in real estate, render Mr. Yellin more of a client than his unwary wife. As such, the Court finds that Mr. Yellin was actually the principal in these proceedings, with his wife his unwitting agent. Mrs. Yellin's signature was in ef-

fect a mere extension of his own,[15] which brings Mr. Yellin within the purview of Rule 9011(b) as a represented client.

Notwithstanding the Court's findings that the conduct of Attorneys Robin and Yellin was unreasonable under the circumstances, the Court simply may not ignore the fact that Rule 9011(b) must be read alongside of Rule 9011(c)(1)(A) with respect to party-initiated motions for sanctions. The Debtor could have acted in conformity with the safe harbor provision but did not. Consequently, although the Court is tempted to sanction Attorneys Robin and Yellin for their objectively unreasonable conduct, the unambiguous text of the statute compels a different result. The Motion for Sanctions with respect to Attorneys Louis Robin and Stephen Yellin is accordingly DENIED.

A separate Order will enter.

---

15. In an order dated December 22, 2004, the Court declined to impose sanctions on Mrs. Yellin. In said Order, the Court found her testimony that she signed the claim at her husband's direction and lacked personal knowledge of the claim's contents credible and, under the circumstances of this case, sufficient to absolve her of liability. Due to her husband's legal training, years of experience and expertise in real estate matters and extensive familiarity with and participation in this case, it was reasonable under the circumstances for her to rely on his advice and assurances.